UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CAVALIERS OPERATING<br>    COMPANY, LLC, et al., | ) | Case 1:07-CV-02317 and related case |
| | ) |    1:08-CV-00240 |
| | ) | |
|            Plaintiffs, | ) | JUDGE KATHLEEN M. O'MALLEY |
| | ) | |
|    v. | ) | MAGISTRATES: BAUGHMAN AND |
| | ) | PERELMAN |
| TICKETMASTER, et al., | ) | |
| | ) | |
|            Defendants. | ) | |
| | ) | |

---

**CAVALIERS' AND FLASH SEATS' MEMORANDUM IN RESPONSE TO
TICKETMASTER'S SUPPLEMENTAL MEMORANDUM IN SUPPORT OF RULE
12(b)(6) MOTION TO DISMISS AMENDED COMPLAINT AND AMENDED
COUNTERCLAIMS**

---

# TABLE OF CONTENTS

**Page**

STATEMENT OF ISSUES ................................................................................................. 1

SUMMARY OF ARGUMENT ........................................................................................ 2

ARGUMENT ..................................................................................................................... 6

    I.        Pleading Standard For Alleging A Relevant Market ............................................. 6

    II.      Plaintiffs Have Alleged Cognizable Product and Geographic Markets................. 8

          A.      Plaintiffs Have Appropriately Defined the Relevant Product Market For Secondary Ticketing Services................................................. 8

          B.      Plaintiffs Can Define the Relevant Market By Reference to the Customers Who Purchase Secondary Ticketing Services - the Venues and Sports Franchises. ............................................................... 11

          C.      Plaintiffs Have Adequately Alleged a Relevant Market For Primary Ticketing ..................................................................................... 15

          D.      Plaintiffs Have Adequately Alleged the Relevant Geographic Market.................................................................................................... 17

          E.      Plaintiffs Have Adequately Alleged That Primary Ticketing Services and Secondary Ticketing Services Are Separate Relevant Markets. ...................................................................................... 19

        III. Conclusion ........................................................................................... 22

i

# TABLE OF AUTHORITIES

## Cases

*Alarmax Distribs., Inc. v Tyco Safety Prods. Canada Ltd.*,
    2008 U.S. Dist. LEXIS 49623, 2008-1 Trade Cas. (CCH) ¶76,214
    (W.D. Pa. June 27, 2008) ............................................................................................. 8

*Am. Council of Cert. Pod. Phys. and Surgeons v Am. Bd. of Pod. Surgery*,
    185 F.3d 606 (6th Cir. 1999) ....................................................................................... 6

*Babyage.com, Inc. v Toys "R" Us, Inc.*,
    2008 U.S. Dist. LEXIS 40476, 2008-1 Trade Cas. (CCH) P76,204 (E.D. Pa. May 19, 2008) .. 7

*Banxcorp v. Bankrate, Inc.*,
    2008 U.S. Dist. LEXIS 5156 (D.N.J. July 7, 2008) .................................................... 9

*Bell Atlantic Corp. v. Twombly*,
    127 S. Ct. 1955 (2007) ............................................................................................... 6

*Brown Shoe Co. v. United States*,
    370 U.S. 294 (1962) ............................................................................................... 8, 11

*Cardizem CD Antitrust Litig.*,
    105 F. Supp. 2d 618 (E.D. Mich. 2000) ..................................................................... 9

*Clarke v. Baptist Memorial Healthcare*,
    2007 U.S. Dist. LEXIS 96710 (W.D. Tenn. May 17, 2007) ....................................... 7

*Cupp v. Alberto-Culver USA, Inc.*,
    310 F. Supp. 2d 963 (W.D. Tenn. 2004)................................................................... 18

*Eastman Kodak Co. v Image Technical Servs., Inc.*,
    504 U.S. 451 (1992)............................................................................................... 6, 20

*Found. for Interior Design Educ. Research v. Savannah Coll. of Art & Design*,
    244 F.3d 521 (6th Cir. 2001) ...................................................................................... 6

*FTC v. Cardinal Health, Inc.*,
    12 F. Supp. 2d 34 (D.D.C. 1998) ........................................................ 11, 12, 13, 14, 16

*FTC v. Staples, Inc.*,
    970 F. Supp. 1066 (D.D.C. 1997) ............................................................................ 11

*FTC v. Whole Foods Market, Inc.*,
    2008 U.S. App. LEXIS 16562 (D.C. Cir. July 29, 2008) ........................................... 12, 14, 16

*Glen Holly Entm't, Inc. v. Tektronix, Inc.*,
   100 F. Supp. 2d 1073 (C.D. Cal. 1999) .................................................................. 9

*Habeeba's Dance of the Arts, Ltd. v. Knoblauch*,
   Case No. 05-926, 2006 U.S. Dist. LEXIS 25837 (S.D. Ohio May 1, 2006) ........................... 22

*Health First, Inc. v. Bronson Methodist Hosp.*,
   1990-2 Trade Cas. (CCH) P69,200, 1990 U.S. Dist. LEXIS 11007
   (W.D. Mich. Aug. 20, 1990) ............................................................................ 18

*Invacare Corp v. Respironics, Inc.*,
   2006 U.S. Dist. LEXIS 77312 (N.D. Ohio Oct. 23, 2006) ......................................... 14

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
   466 U.S. 2 (1984) ..................................................................................... 20

*Kodak Co. v Image Technical Servs., Inc.*,
   504 U.S. 451 (1992) ............................................................................... 20, 21

*Louisiana Wholesale Drug Co., Inc. v. Sanofil-Aventis U.S., LLC*,
   2008 U.S. Dist. LEXIS 3611, 2008-1 Trade Cas. (CH) ¶76,050
   (S.D.N.Y. Jan. 18, 2008) .............................................................................. 8

*Multistate Legal Studies v. Harcourt Brace Jovanovich Legal & Professional Publications, Inc.*,
   63 F.3d 1540 (10th Cir. 1995) ........................................................................ 21

*Nat'l Hockey League Players Ass'n v Plymouth Whalers Hockey Club*,
   419 F.3d 462 (6th Cir. 2005) ........................................................................... 2

*Parts and Electric Motors, Inc. v. Sterling Electric, Inc.*,
   826 F.2d 712 (7th Cir. 1987) ......................................................................... 21

*Passa v. City of Columbus*,
   Case No. 03-4111, 2005 U.S. App. LEXIS 2832 (6th Cir. Feb. 16, 2005) ........................... 22

*PepsiCo, Inc. v. Coca-Cola Co.*,
   1998 U.S. Dist LEXIS 13440 (S.D.N.Y Aug 27, 1998) .............................................. 12

*PSI Repair Servs. v. Honeywell, Inc.*,
   104 F.3d 811 (6th Cir. 1997) ...................................................................... 20, 21

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
   124 F.3d 430 (3d Cir. 1997) .......................................................................... 14

*Roth Steel Prods. v. Sharon Steel Corp.*,
   705 F.2d 134 (6th Cir. 1982) ......................................................................... 22

*Smith v. Multi-Flow Dispensers of Ohio, Inc.*,
    1999 U.S. App. LEXIS 6845 (6th Cir. May 14, 1999) ........................................ 14

*Spirit Airlines, Inc. v. Northwest Airlines, Inc.*,
    431 F.3d 917 (6th Cir. 2005) ........................................................................ 21

*Tampa Elec. Co. v. Nashville Coal Co.*,
    365 U.S. 320 (1961) ..................................................................................... 6

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001) ........................................................................ 2, 7

*United States v. E.I. DuPont de Nemours & Co.*,
    351 U.S. 377 (1956) ..................................................................................... 9

*United States v. Sungard Data Sys., Inc.*,
    172 F. Supp. 2d 172 (D.D.C. 2001) ............................................................... 10

*Weiner v. Klais & Co.*,
    108 F.3d 86 (6th Cir. 1997) ......................................................................... 22

*White & White, Inc. v. Am. Hosp. Supply Corp.*,
    723 F.2d 495 (6th Cir. 1983) ......................................................................... 6

*White & White, Inc. v. American Hospital Supply Corp.*,
    723 F.2d 495 (6th Cir. 1983) ....................................................................... 11

*White Mule Co. v. ATC Leasing Company LLC*,
    540 F. Supp. 2d 869 (N.D. Ohio 2008) ......................................................... 6, 7

*Worldwide Basketball & Sport Tours, Inc. v. NCAA*,
    388 F.3d 955 .............................................................................................. 11

*Xerox Corporation v. Media Sciences International, Inc.*,
    511 F. Supp. 2d 372 (S.D.N.Y. 2007) .............................................................. 7

**Rules**
Fed. R. Evid. 201(b) ............................................................................................ 22

**STATEMENT OF ISSUES**

Whether Plaintiffs' relevant market allegations are sufficient to withstand a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6)?

## SUMMARY OF ARGUMENT

Cavaliers Operating Company, LLC and Flash Seats LLC (collectively, "Plaintiffs") file this joint response to Ticketmaster's Supplemental Memorandum in Support of Rule 12(b)(6) Motion to Dismiss Amended Complaint and Amended Counterclaims ("TM Memo"), which was filed on August 5, 2008 in response to the Court's request for additional briefing on the issue of market definition.

In its Memorandum in Support of Motion to Dismiss Counts I Through V of the Amended Complaint, Ticketmaster failed to challenge Plaintiffs' relevant market allegations. Ticketmaster challenged virtually every aspect of Plaintiffs' antitrust (and non-antitrust) claims, but tellingly chose not to question those allegations relating to the relevant market.[1]  Allowing those allegations to go unchallenged reflected, no doubt, a recognition that the allegations were sound and clearly not viable issues to raise on a motion to dismiss.  Indeed, the common judicial understanding is that market definition in an antitrust case is a "deeply fact-intensive inquiry" that generally requires discovery, making courts in the Sixth Circuit and elsewhere hesitant to grant motions to dismiss based on challenges to the nature and scope of the alleged relevant market(s).  *Nat'l Hockey League Players Ass'n v. Plymouth Whalers Hockey Club*, 419 F.3d 462, 472 n.3 (6th Cir. 2005) (quoting *Todd v. Exxon Corp.*, 275 F.3d 191, 199-200 (2d Cir. 2001).  In light of this standard and the substance of Plaintiffs' relevant market allegations, it is not surprising that Ticketmaster failed to challenge those allegations in its Motion to Dismiss.  Now in hindsight, and provided a second opportunity to challenge those allegations, Ticketmaster has attempted to cobble together arguments as to why Plaintiffs' relevant market allegations are, in

---

[1] To its credit, Ticketmaster notes this fact in its Memorandum, stating that its Motion to Dismiss was "not premised on the Cavs/FS' failure adequately to plead relevant markets." (TM Memo at 2)

fact, inadequate.   A review of the allegations in the Amended Complaint, however, clearly demonstrates that Ticketmaster's arguments have no merit.

The Amended Complaint alleges two relevant markets, the first being the market for primary ticketing, which includes products and services that are sold to sports and entertainment venues, sports franchises and others in order to facilitate the initial sale of an event ticket to a purchaser.  (Am. Compl. ¶ 45.)  The Amended Complaint also alleges a relevant market for secondary ticketing, which includes products and services that are sold to venues and sports franchises in order to facilitate the reselling of event tickets from one purchaser to another.  (*Id.* at ¶ 48.)  As the allegations make clear, this case involves the markets for ***products and services sold or provided to venues and sports franchises***, not the ultimate ticket purchasers.  Ticketmaster's unlawful tying and exclusive dealing arrangements have injured these venues and sports franchises by denying them access to lower cost and higher quality competitive alternatives for the provision of secondary ticketing services.  (Am. Compl. ¶ 42.)  Providers of secondary ticketing services to these venues and sports franchises have likewise been injured as a result of such conduct, which has foreclosed Flash Seats and other actual or potential providers of secondary ticketing services from in excess of 50 percent of the secondary ticketing market.  (Am. Compl. ¶¶ 41, 50.)  While Plaintiffs do allege that Ticketmaster's anticompetitive practices have also denied the ticket-buying public access to competitive alternatives that provide for lower overall ticket prices and enhanced value in buying, selling, and transferring tickets in the secondary market (*id.* at ¶ 42), the harm to ticket purchasers is a byproduct of the direct harm suffered by venues and sports franchises (and the providers of secondary ticketing services to such venues and sports franchises) resulting from Ticketmaster's competition-reducing behavior.

Ticketmaster attempts to obfuscate the relevant market issue by raising a series of ***factual*** arguments as to which products should or should not be in the market, and claiming that Plaintiffs have arbitrarily excluded from the market reasonable alternatives to secondary ticketing.  Ticketmaster argues, for example, that Plaintiffs' allegations are inadequate because they fail to account for market participants such as "online marketplaces" for the reselling of tickets.  (TM Memo at 7.)  Yet "online marketplaces" do not provide products and services to venues and sports franchises in connection with the resale of tickets.  Thus, venues and sports franchises do not view "online marketplaces" as competitive substitutes for the products and services provided by Ticketmaster, Flash Seats, and other providers of secondary ticketing services to those venues and sports franchises.

Ticketmaster likewise argues that Plaintiffs impermissibly limit the relevant market to a certain class of customers, but courts have consistently held that such a limitation is entirely proper, in particular where, as here, the customers cannot easily switch their purchases from one type of provider to another.  The Amended Complaint alleges relevant markets for primary and secondary ticketing for major sports and entertainment venues, which include those sports and other live entertainment venues with sufficient seating capacity and numbers of tickets sold to require the use of sophisticated ticketing software, hardware, and/or services offered by an established ticketing-services provider with demonstrated reliability and electronic ticketing capabilities. (Am. Compl. ¶ 46.)  By definition, these venues and sports franchises require ticketing services such as those provided by Ticketmaster, Flash Seats and others, and cannot easily switch, if at all, to other products or services.  As alleged in the Amended Complaint, if prices for secondary ticketing for major sports and entertainment venues increased by a small but significant amount, a sufficient number of secondary ticketing customers would not instead

4

purchase some other good or service to make that price increase unprofitable. (*Id.* at ¶ 49.) Moreover, primary ticketing and secondary ticketing products and services are not substitutable with one another or with any other product or service.  (*Id.*)

Ticketmaster's other arguments are similarly unavailing.  Ticketmaster asserts that Plaintiffs have failed to allege any facts to support a geographic market outside the Cleveland metropolitan area, yet the Amended Complaint is replete with allegations regarding Ticketmaster's market-wide use of unlawful tying and exclusive dealing arrangements, as well as Flash Seats' attempts to compete broadly within the secondary ticketing market. (Am Compl. ¶¶ 3-5, 30-42.)  The very fact that Ticketmaster, a California company, is supplying secondary ticketing products and services to Cavaliers, located in Ohio, belies any notion that the market for such services is anything other than national in scope.

Ticketmaster's contention that primary and secondary ticketing services are not separate products because Cavaliers' RFP for ticketing services allegedly required that any potential ticketing service provider bid to supply both primary and secondary ticketing services is factually inaccurate and legally unsound.  Not surprisingly, Ticketmaster cites no case law for this wholly conclusory argument and, indeed, the law is quite to the contrary.  Likewise, the industry, as witnessed by materials submitted along with Ticketmaster's brief, recognizes primary and secondary ticketing as separate markets.  (TM Memo at Ex. 3.)  Notably, Ticketmaster's Motion to Dismiss did not challenge Plaintiffs' allegation that primary ticketing and secondary ticketing constitute two distinct products or services.  Ticketmaster's after-the-fact argument here lacks merit.

Ultimately, determining the exact contours of the relevant market - including the specific products, service and competitors within that market - requires a factual determination that is

inappropriate at the motion to dismiss stage.  Ticketmaster's attempt to interject such facts as a means to challenge Plaintiffs' relevant market allegations simply cannot be sustained.  Plaintiffs' relevant market allegations more than satisfy the relevant pleading standards on a motion to dismiss, and Ticketmaster's motion should therefore be denied.

## ARGUMENT

## I.      Pleading Standard For Alleging A Relevant Market

A relevant product market consists of "products or services that are reasonably interchangeable with, as well as identical to," the defendant's products or services.  *Am. Council of Cert. Pod. Phys. and Surgeons v. Am. Bd. of Pod. Surgery*, 185 F.3d 606, 622 (6th Cir. 1999). The relevant geographic market is "the market area in which the seller operates, and to which the purchaser can practicably turn for supplies."  *White & White, Inc. v. Am. Hosp. Supply Corp.*, 723 F.2d 495, 501 (6th Cir. 1983) (citing *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961)).

Courts are reluctant to grant motions to dismiss for failure to adequately allege a relevant market because market definition involves a highly fact-based analysis that generally requires discovery.  *Found. for Interior Design Educ. Research v. Savannah Coll. of Art & Design*, 244 F.3d 521, 531 (6th Cir. 2001); *Eastman Kodak Company v. Image Technical Services, Inc.,* 504 U.S. 451, 482, 112 S.Ct. 2072, 2090, 119 L.Ed.2d 265 (1992) ("The proper market definition ... can be determined only after a factual inquiry into the "commercial realities" faced by consumers. *United States v. Grinnell Corp.,* 384 U.S., at 572, 86 S.Ct., at 1704.").  The Supreme Court's clarification of antitrust pleading standards in *Bell Atlantic Corp. v. Twombly,* 127 S. Ct. 1955, 1965 (2007) did nothing to change this.  *See, e.g.*, *White Mule Co. v. ATC Leasing Company LLC*, 540 F. Supp. 2d 869, 886 (N.D. Ohio 2008) (applying *Twombly* and noting inclination to

withhold definitive judgment on the parameters of market until the conclusion of discovery); *Xerox Corporation v. Media Sciences International, Inc.*, 511 F. Supp. 2d 372 (S.D.N.Y. 2007) (applying *Twombly* and denying motion to dismiss where market definition was "both plausible and [bore] a rational relationship to the rule of reasonable interchangeability.").

At the 12(b)(6) stage, it is sufficient to allege facts that support a product market "in a way that is plausible and bears a rational relation to the methodology courts prescribe to define a market for antitrust purposes." *White Mule*, 540 F. Supp. 2d at 886 (quoting *Todd*, 275 F.3d at 203). Applying this analysis, courts typically deny motions to dismiss claims that appear plausible on their face without requiring detailed factual allegations. *See, e.g.*, *Babyage.com, Inc. v. Toys "R" Us, Inc.*, 2008 U.S. Dist. LEXIS 40476 at *8, 2008-1 Trade Cas. (CCH) P76,204 (E.D. Pa. May 19, 2008) (separate markets for "high-end baby and juvenile  strollers" and other "high-end" baby products accepted on motion to dismiss; evidentiary details specifying price points, identities of manufacturers, and identities of retailers "not required at the motion-to-dismiss stage"); *Xerox*, 511 F. Supp. 2d at 384 (alleged market for the "sale of replacement solid in sticks for use in Xerox phase change color printers"  was "plausible and [bore] a rational relationship to the rule of reasonable interchangeability"); *Clarke v. Baptist Memorial Healthcare*, 2007 U.S. Dist. LEXIS 96710 at *37-38 (May 17, 2007 W.D. Tenn.) (market definition distinguishing hospital-nurse positions from non-hospital-nurse positions sufficiently alleged where it was "not clear" the market excluded reasonably interchangeable alternatives).

Courts similarly deny motions to dismiss claims that raise factual issues incapable of resolution on a motion to dismiss. *See, e.g.*, *White Mule*, 540 F. Supp. 2d at 892 ("at this stage of the litigation, I accept White Mule's contention that the relevant market for products necessary to compete in the truck delivery market is identical to the products covered by the defendants'

7

fraudulently obtained patents"); *Alarmax Distribs., Inc. v. Tyco Safety Prods. Canada Ltd.*, 2008 U.S. Dist. LEXIS 49623, 2008-1 Trade Cas. (CCH) ¶76,214 (W.D. Pa. June 27, 2008) (alleged market of "the sale of burglar alarm products to independent distributors for resale" accepted for motion to dismiss, possibly to be revisited at summary judgment stage); *Louisiana Wholesale Drug Co., Inc. v. Sanofil-Aventis U.S., LLC*, 2008 U.S. Dist. LEXIS 3611, 2008-1 Trade Cas. (CH) ¶76,050 (S.D.N.Y. January 18, 2008) (accepting alleged market limited to "the brand Arava (leflunomide) and its generic AB-rated equivalents" and noting issues of fact that cannot be decided on motion to dismiss).

Against this standard, Plaintiffs' allegations are entirely plausible and do not require the level of factual amplification that Ticketmaster demands.  Plaintiffs have identified a definable set of products and services, the customers to whom such products and services are sold, and the geographic area in which such products and services are sold.  Ticketmaster's argument that Plaintiffs must identify with greater specificity the competitors in the secondary ticketing market and the various specific products that come within secondary ticketing (TM Memo at 9-10) is not warranted, and would require the very sort of factual determination that courts have eschewed at the pleading stage.

## II.    Plaintiffs Have Alleged Cognizable Product and Geographic Markets.

### A.    Plaintiffs Have Appropriately Defined the Relevant Product Market For Secondary Ticketing Services.

As explained by the Supreme Court, the outer boundaries of the relevant product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it.  *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962).  Thus, the relevant product market involves the identification of those products or services that are either identical to or available substitutes for the defendant's product or service.

*United States v. E.I. DuPont de Nemours & Co.*, 351 U.S. 377 (1956).  In analyzing a proposed relevant market, the "relevant markets are to be judged from the consumers' perspective . . ." *In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 618, 680 (E.D. Mich. 2000).  A court must examine the language of the complaint to determine the proper consumer from whose perspective the relevant market must be defined.  *See Banxcorp v. Bankrate, Inc.*, 2008 U.S. Dist. LEXIS 5156, *18-19 (D.N.J. July 7, 2008) (concluding that "if the injury alleged is to financial institutions, [plaintiff] must define its relevant market from the perspective of those financial institutions"); *Glen Holly Entm't, Inc. v. Tektronix, Inc.*, 100 F. Supp. 2d 1073, 1078 (C.D. Cal. 1999) (noting that, despite the defendants assertion that plaintiff is merely an intermediary, the allegations in the complaint support plaintiff's position that it was the "ultimate consumer in the alleged product market and any harm to plaintiff's customers was derivative of such harm to the plaintiff").

As alleged in the Amended Complaint, the consumers of secondary ticketing services are the venues and sports franchises.  (Am Compl. ¶¶ 45, 48.)  Ticketmaster's unlawful tying and exclusive dealing arrangements have been directed at these consumers, and it is these consumers that have been denied access to competing secondary ticketing providers as a result of Ticketmaster's anticompetitive conduct.  (Am. Compl. ¶¶ 30-40.)  It is the market for secondary ticketing services provided to venues and sports franchises in which competition has been restrained, and for which Flash Seats and Cavaliers claim to have suffered injury.

Ticketmaster argues that Plaintiffs' allegations are nevertheless defective because they exclude from the market ticket brokers and other third-party ticket resellers that do not provide products or services to venues and sports franchises in connection with the resale of event tickets.  (TM Memo at 9.)  If, however, the relevant market is to be judged from the consumers'

perspective, and if, as alleged, the consumers injured as a result of Ticketmaster's unlawful conduct are the venues and sports franchises, it follows that ticket resellers that do not offer or provide secondary ticketing services to venues and sports franchises do not compete in the relevant market and should be excluded from the relevant market definition.  Venues and sports franchises do not view these entities as competitive substitutes and would not switch to using these entities if the price for secondary ticketing services were to go up.  (Am. Compl. ¶ 49.) More generally, venues and sports franchises do not view any products or services as substitutable with those that they obtain from Ticketmaster, Flash Seats or other providers of primary or secondary ticketing services.  (*Id.*)

Ticketmaster's argument that "internally developed secondary ticketing solutions" are part of the relevant market is vague and interposes a factual allegation that is outside the scope of the Amended Complaint and entirely inappropriate for consideration on a motion to dismiss.  As previously noted, the Amended Complaint alleges that there are no substitutes for the secondary ticketing services provided to venues and sports franchises.  (*Id.* at ¶¶ 46, 49-50.).  At this stage, Plaintiffs are not required to further identify all of the various products and services that are *not* substitutable with those services, including the hypothetical "internally developed secondary ticketing solutions" suggested by Ticketmaster.  The case cited by Ticketmaster to support this argument, *United States v. Sungard Data Sys., Inc.*, 172 F. Supp. 2d 172 (D.D.C. 2001), was decided in the context of a motion to preliminarily enjoin a merger (which requires a higher burden of proof than on a motion to dismiss), and the record was clear that the customers' "internal hotsites do, in fact, compete with the external shared hotsite business."  *Id.* at 186. Here, there are no facts to suggest that internally developed secondary ticketing solutions, if they exist at all, compete with secondary ticketing services.

B.     **Plaintiffs Can Define the Relevant Market By Reference to the Customers Who Purchase Secondary Ticketing Services - the Venues and Sports Franchises.**

Ticketmaster erroneously argues that Plaintiffs' "attempt to define a relevant market for secondary ticketing by reference to the customers served . . . is legally flawed . . ." (TM Memo at 12.)  Such an argument is directly contrary to the well-established law regarding relevant markets.

Courts have routinely found that within a broad market, "well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes." *Brown Shoe*, 370 U.S. at 325.[2]  Moreover, the boundaries of such a submarket may be determined by examining the practical indicia of the economic reality of the markets, including: (1) industry or public recognition of the submarket as a separate economic entity, (2) the product's peculiar characteristics and uses, (3) unique production facilities, (4) ***distinct customers***, (5) distinct prices, (6) sensitivity to price changes, and (7) specialized vendors.  *White & White, Inc. v. American Hospital Supply Corp.*, 723 F.2d 495, 501 (6th Cir. Mich. 1983) (quoting *Brown Shoe*, 370 U.S. at 325).  A submarket may exist even if only some of the factors are present.  *See e.g., FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1075 (D.D.C. 1997).

Under this analysis, courts have long accepted that a relevant submarket may be based on a discernable customer base that cannot easily switch their purchases from one type of provider to another.  *See FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 47-48 (D.D.C. 1998); *Staples, Inc.*, 970 F. Supp. at 1075.  Notably, a recent decision by the D.C. Circuit concluded that certain

---

[2] Although the *Brown Shoe* submarket analysis is often cited in the analysis of merger cases falling under Section 7 of the Clayton Act, many courts, including the Sixth Circuit, have applied the *Brown Shoe* indicia when examining antitrust violations under the Sherman Act.  *See Worldwide Basketball & Sport Tours, Inc. v. NCAA*, 388 F.3d 955 (6th Cir. Ohio 2004) (in the context of a Sherman § 1 case, noting that "within a product market, 'well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes.'") (citing *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)).

consumers may form the basis for a submarket because "when one or a few firms differentiate themselves by offering a particular package of goods or services, it is quite possible for there to be a central group of customers for whom only that package will do."  *FTC v. Whole Foods Market, Inc.*, 2008 U.S. App. LEXIS 16562, at *20-21 (D.C. Cir. July 29, 2008) (internal citations omitted).

Further, a relevant market may be based on a certain consumer base when the plaintiff alleges that the products and services provided to those consumers are unique.  In *FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34 (D.D.C. 1998), the FTC alleged that the relevant product market was the portion of the pharmaceutical industry that specialized in wholesale distribution of prescription drugs.  Defendants disputed this, stating that the end customers could obtain their drugs from many other sources, so the FTC's proposed market was artificially narrow, and therefore not viable.  The court agreed with the FTC, emphasizing that the FTC presented evidence demonstrating the uniqueness of the drug wholesale industry and highlighting the differences in services provided by wholesalers and the other supply sources. The court focused on three points: 1) wholesale drug delivery was a more sophisticated grouping of products and services than defendants suggested; 2) wholesalers provide an efficient way to obtain prescription drugs that other suppliers do not; and 3) wholesalers also supply additional services that other suppliers do not.  Similarly, the D.C. Circuit has recently approved of the FTC's market definition of "premium, natural and organic supermarkets," in the context of a merger, "because in some situations core consumers, demanding exclusively a particular product or package of products, distinguish a submarket."  *Whole Foods Market, Inc.*, 2008 U.S. App. LEXIS 16562, at *28; *see also PepsiCo, Inc. v. Coca-Cola Co.*, 1998 U.S. Dist LEXIS 13440 (S.D.N.Y Aug 27, 1998) (denying a motion to dismiss based on Pepsi's alleged market of "sales

of fountain-dispensed soft drinks distributed through independent foodservice distributors throughout the United States" because Pepsi had alleged: 1) there are no viable substitutes to fountain-dispensed soft drinks distributed through independent foodservice distributors; 2) there is a distinction between the product alleged and "fountain dispensed drinks distributed by any other means"; and 3) the consumer has efficiency based reasons to take the alleged package of products and services over another form of distribution).

Here, Plaintiffs' allegations are analogous to those in *Cardinal Health*, and therefore their claims may not be disposed of on a motion to dismiss.  Plaintiffs allege that Flash Seats offers a different set of ticketing services than offered by ticket brokers or other third-party resellers that do not provide services to venues and sports franchises.  (*See* Am. Compl. ¶ 28) (describing the advantages of Flash Seats' ticketing services that are not available to the venues through the use of third-party ticket brokers); (*Id*. at ¶ 48) (alleging that the secondary ticketing market excludes brokers and third-party ticket sellers because those types of sellers "do not provide products or services to sports and entrainment venues or sports franchises in connection with the resale of event tickets").  More specifically, Flash Seats offers its customers -- the major venues -- a distinct set of ticketing services that allow them to capture more of the secondary market revenue stream and the ability to access marketing data and demographics which allows those customers to further develop their marketing techniques and relationships.  (*Id*. at ¶28.)  Ticketmaster competes against Flash Seats with respect to these customers through its TeamExchange product, which offers similar functionality although of lower quality and at a higher price.  (*Id*. at ¶¶ 26-27, 29.)

The Amended Complaint alleges, moreover, that the secondary ticketing services are purchased only by major venues -- a group of consumers that require a particular package of

goods and services.  *Whole Foods Market*, 2008 U.S. App. LEXIS 16562 at *20-21.  Plaintiffs allege that these major venues "require the use of sophisticated ticketing software, hardware, and/or services offered by an established ticketing-services provider with demonstrated reliability and electronic ticketing capabilities."  (Am. Compl. ¶ 46.)  For major venues and sports franchises, then, the services offered by Flash Seats and other secondary ticketing providers are not interchangeable with services that may be provided by ticket brokers or other third-party ticket resellers to the ultimate ticket purchaser.  Flash Seats and other secondary ticketing providers offer an efficient way for venues and sports franchises to serve their fans that cannot be achieved through third-party resellers, and they provide additional services to venues and sports franchises than are provided by third-party resellers.  When a plaintiff has alleged a product market with such characteristics, such a market may be its own relevant product market for antitrust purposes.  *See Cardinal Health*, 12 F. Supp. 2d at 47-48.

The case law on which Ticketmaster relies is inapposite to the facts of this case because those cases address situations where the products or services offered were ***completely interchangeable*** with one another.[3]  Such is not the case here, where the services provided by Ticketmaster and Flash Seats to venues and sports franchises are not interchangeable with services that may be provided to ticket purchasers by online marketplaces or other third-party ticket resellers.

---

[3] For example, in *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430 (3d Cir. 1997), the plaintiffs, franchisees of the defendant, alleged violations of the Sherman Act.  Plaintiffs claimed that the relevant market was pizza ingredients purchased by Domino's franchisees.  The court held that this could not stand as a relevant product market, because, but for the franchise contract, the Domino's pizza ingredients were reasonably interchangeable with other suppliers' pizza ingredients.  *See also Smith v. Multi-Flow Dispensers of Ohio, Inc.*, 1999 U.S. App. LEXIS 6845, at *11-13 (6th Cir. May 14, 1999) (no submarket for supplying beverage dispensing equipment and related products to "taverns and locally owned business," where those products and services were "***identical and interchangeable***" with those products and services supplied to national customers) (emphasis added); *Invacare Corp v. Respironics, Inc.*, 2006 U.S. Dist. LEXIS 77312, at * 19 (N.D. Ohio Oct. 23, 2006) (no submarket for "sales of masks to sleep labs" where the masks sold to sleep labs were the same exact masks sold to other consumers).

14

Ticketmaster's assertion that Flash Seats must specifically describe why venues and sports franchises require the particular ticketing services at issue is unfounded. (TM Memo at 13.) First, as noted above, Flash Seats is not required to allege each and every fact related to the relevant product market in its Amended Complaint, but is only required to allege sufficient facts to prove the contours of a plausible relevant market.  As Ticketmaster admits in its brief, "discovery is often required to determine the contours of a relevant market." (*Id.* at 4.)  Second, Flash Seats allegations relating to the relevant products markets are not conclusory or vague, but contain specific allegations regarding what services or products are included in the market, and why other products or services are not interchangeable with those services.

### C.    Plaintiffs Have Adequately Alleged a Relevant Market For Primary Ticketing.

Ticketmaster advances essentially the same arguments to challenge Plaintiffs' relevant market for primary ticketing services.  Ticketmaster argues that Plaintiffs' allegations are deficient because they exclude alleged "home-grown" software and hybrid ticketing solutions, they exclude competitors that do not use phone systems, and they define the market with respect to the class of customers who purchase primary ticketing services.

Ticketmaster's arguments, again, seek to interject factual issues into the equation that are inappropriate and cannot be disposed of on a motion to dismiss.  Ticketmaster's ambiguous reference to "home-grown" software and hybrid ticketing solutions is contradicted by the allegations of the Amended Complaint, which clearly state that there are no substitutes for primary ticketing services (Am. Compl. ¶ 49), that self-ticketing is not an economically viable alternative to contracting with Ticketmaster for primary ticketing services (*id.* at 18), and that there are a lack of meaningful competitive alternatives to the primary ticketing services offered by Ticketmaster (*id.* at 39).  Ticketmaster's suggestion that the alleged relevant market is

15

deficient because it excludes competitors that do not use phone systems likewise seeks to argue the facts rather than the law.  Moreover, it is entirely plausible that a venue or sports franchise would refuse to consider a ticketing services provider that did not provide even basic phone access for its fans to purchase tickets.

Ticketmaster's argument that the market for primary ticketing cannot be defined by reference to the customers for primary ticketing services is identical to its argument with respect to the secondary ticketing market.  As discussed above, courts have long held that a specific set of consumers may be the basis for a product market for antitrust purposes, where the plaintiff also alleges that the products and services sold to that consumer base are unique and not reasonably interchangeable with products and services sold by other providers.  *See Whole Foods Market, Inc.*, 2008 U.S. App. LEXIS 16562, at *20-21; *Cardinal Health, Inc.*, 12 F. Supp. 2d at 47-48.  To this end, the Amended Complaint alleges that primary ticketing includes those "products and services that are sold to sports and entertainment venues, sports franchises and others in order to facilitate the initial sale of an event ticket to a purchaser by either the venue or, in most cases, a primary ticketing agent . . ." (Am. Compl. ¶ 45.), that "major venues are those sports or other live entertainment venues with sufficient seating capacity and numbers of tickets sold to require the use of sophisticated ticketing software, hardware, and/or services. . ." (*Id.* at ¶ 46.), and that primary ticketing services are not substitutable with any other product or service. (*Id.* at 49.)  Where, as here, a plaintiff has alleged a relevant market based on a specific consumer base, and also that the products and services offered to that consumer base are unique, a defendant's motion to dismiss must be denied.

16

**D.      Plaintiffs Have Adequately Alleged the Relevant Geographic Market.**

The Amended Complaint alleges that the relevant markets in this case are for primary and secondary ticketing services "for major sports and entertainment venues *in the United States*." (Compl. ¶¶ 45, 48) (emphasis added).  Ticketmaster challenges Plaintiffs' alleged geographic market on the grounds that Plaintiffs "do not allege that Flash Seats competes against Ticketmaster for any other clients in other particular geographic areas (outside of the Cleveland metropolitan area).  (TM Memo at 16.)

Contrary to Ticketmaster's assertion, the Amended Complaint contains numerous allegations demonstrating that competition in the primary and secondary ticketing services markets is national in scope.  The Amended Complaint alleges, for example, that Ticketmaster has engaged in market-wide unlawful tying and exclusive dealing arrangements with its primary ticketing customers, which include, among many others, 26 of 30 National Basketball Association teams, 31 of 32 National Football League teams, and 26 of 30 National Hockey League teams and their associated arenas or stadiums.  (Am. Compl. ¶¶ 21, 22.)  These customers are located throughout the United States, and Flash Seats and other actual or potential competitors in the secondary ticketing service market have been foreclosed generally from these customers.  (*Id.* at ¶ 41.)

The Amended Complaint further alleges that Flash Seats has attempted to provide secondary ticketing services to various of Ticketmaster's primary ticketing customers but has been unable to do so as a result of Ticketmaster's anticompetitive conduct.  (*Id.* at ¶ 38.) Ticketmaster has itself acknowledged in this litigation that Plaintiffs "are improperly marketing Flash Seats to [Ticketmaster's] other clients," (*id.* at ¶ 34) and that Plaintiffs "have approached other companies with whom Ticketmaster has exclusive ticketing contracts, and have attempted

to persuade those companies to substitute Flash Seats' technology and services for those of Ticketmaster." (*See* First Amended Complaint ¶ 27, *Ticketmaster-Indiana v. Cavaliers Operating Co.*, Case No. 08-240).  In short, Ticketmaster's suggestion that Plaintiffs have failed to allege that Flash Seats competes against Ticketmaster anywhere other than Cleveland is directly contradicted by the allegations of the Amended Complaint and is entirely baseless.

The allegation that the markets for primary and secondary ticketing services are national in scope is further supported by the fact that Cavaliers, whose principal place of business is in Cleveland, Ohio (Am. Compl. ¶ 11.), is supplied by Ticketmaster, whose principal place of business is in West Hollywood, California.  (Am. Compl. ¶ 13.)  Moreover, there is nothing in the Amended Complaint to suggest that the software, hardware, and other components of both primary and secondary ticketing services are *sui generis* to any regional market within the United States.  To the contrary, the Amended Complaint demonstrates that Ticketmaster supplies those products to customers throughout the United States, and Flash Seats has attempted to compete against Ticketmaster in providing secondary ticketing services on a national level.  In light of the foregoing, Plaintiffs' allegation of a national geographic market for primary and secondary ticketing services is factually supported and eminently reasonable.

Ticketmaster's reliance on *Health First, Inc. v. Bronson Methodist Hosp.*, 1990 U.S. Dist. LEXIS 11007, 1990-2 Trade Cas. (CCH) P69,200, (W.D. Mich. Aug. 20, 1990) and *Cupp v. Alberto-Culver USA, Inc.*, 310 F. Supp. 2d 963 (W.D. Tenn. 2004) is misplaced.  In *Health First*, the plaintiff health providers alleged the relevant geographic market in the complaint, but failed to allege any facts to support it.  *Id.* at *5.  Similarly, in *Cupp*, the court observed that the plaintiff had failed to make any statement whatsoever about what the relevant geographic market was.  *Cupp*, 310 F.Supp. 2d at 970.  Left to attempt to cobble together a possible geographic

18

market from various vague statements in the complaint about the plaintiff's inability to obtain wanted products in the Memphis, Tennessee area, and the defendants' international reach, the court simply could not discern a unified statement of a single geographic market.  These cases are inapposite because Plaintiffs have clearly alleged a relevant geographic market that is amply supported by other allegations in the Amended Complaint.

E.      **Plaintiffs Have Adequately Alleged That Primary Ticketing Services and Secondary Ticketing Services Are Separate Relevant Markets.**

Ticketmaster's final argument is that primary ticketing services and secondary ticketing services do not constitute separate relevant markets because a Cavaliers' RFP for ticketing services required that any potential ticketing service provider submit a proposal to supply both primary and secondary ticketing services.  (TM Memo at 18.)  This, of course, is a remarkable argument given that Ticketmaster failed in its Motion to Dismiss to challenge Plaintiffs' allegation that primary and secondary ticketing constituted separate products for purposes of their tying claim.  But aside from that, *Ticketmaster's characterization of the RFP is simply not consistent* with testimony that the RFP sought but, as a request for proposal, could not "require" a broad spectrum of products from those submitting proposals.[4]  Even if Ticketmaster's characterization of the RFP were accurate, the fact that a single customer requests that bidders be able to supply two separate products as part of a package does not lead to the conclusion that the two products are part of a single relevant market.  Tellingly, Ticketmaster cites no case law to support this argument, and common sense dictates otherwise.  For example, asphalt and gravel do not constitute a single relevant market merely because a state contract requests that both be

---

[4] The RFP sought a proposal that group ticket sales, individual sales, plan sales, secondary ticketing programs, account management, access control programs, e-commerce, CRM systems, corporate sales and reporting all operate on a single system.  Nothing in the RFP required the supplier to be able to provide both primary and secondary ticketing services or the Cavaliers to use them, and, indeed, Cavaliers never actually used Ticketmaster's secondary ticketing products and services but instead utilized Flash Seats.  The fact that Cavaliers obtained secondary ticketing services from a separate company belies any suggestion that Cavaliers, through an ambiguous RFP request, view ticketing services as part of a single relevant market.

supplied as part of a single bid.  Moreover, as has been made clear in this circuit and others, the fact that some consumers may desire a unified product composed of more than one component part does not render such products a single product with a single market for purposes of antitrust analysis.  *See PSI*, 104 F.3d at 816 ("Honeywell's characterization of its customers' needs [for both service and parts] moves us no closer to the resolution of the separate-products issue in this dispute,"  just as the same issue "had no bearing on the *Kodak* Court's  inquiry into whether parts and services could be distinct products for antitrust purposes in that case.").

For two items to be considered distinct products, "there must be sufficient consumer demand so that it is efficient for a firm to provide [one] separate from [the other]."  *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 462 (1992); *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 21-22 (1984).  In making this determination, the focus is "not on the functional relation between them, but rather on the character of the demand for the two items."  *Jefferson Parish*, 466 U.S. at 19.  Indeed, as observed by the *Kodak* court: "We have often found arrangements involving functionally linked products at least one of which is useless without the other to be prohibited tying devices."  504 U.S. at 463.

The complaint describes in detail the separate markets for primary and secondary ticketing services, and their respective unique characteristics and customer demands. (Am Compl. ¶¶ 2, 3,17, 24, 25-29, 45-49.)  Nothing more is required at this stage.

Ticketmaster cannot credibly claim that because it impermissibly ties its primary ticketing services to secondary ticketing services as part of its exclusive contracts, only one unified market for ticketing services exists.  Such claim ignores the reality of the marketplace and is contradicted by the great weight authority.  *See, e.g., Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 462 (1992) (market for replacement parts for Kodak brand photocopier

20

equipment was distinct from market for service of such equipment); *PSI Repair Servs. v. Honeywell, Inc.*, 104 F.3d 811, 816 (6th Cir. 1997) (separate markets for industrial equipment circuit boards and replacement services); *Multistate Legal Studies v. Harcourt Brace Jovanovich Legal & Professional Publications, Inc.*, 63 F.3d 1540 (10th Cir. 1995) (separate markets for full bar examination preparation course and the course for the multi-state portion of the bar exam); *Parts and Electric Motors, Inc. v. Sterling Electric, Inc.*, 826 F.2d 712, 719-20 (7th Cir. 1987) (separate markets for electric motors and repair parts).  The very fact that secondary ticketing services providers such as Flash Seats exist apart from primary ticketing service providers is evidence of separate customer demand and the efficiency of a firm providing only secondary ticketing services.  *See Kodak*, 504 U.S. at 462 ("The development of the entire high-technology service industry is evidence of the efficiency of a separate market for service."); *PSI*, 104 F.3d at 816 ("PSI's very existence indicates the possibility of separate market for service, because PSI does not manufacture any of the component parts.").  Flash Seats has been providing only secondary ticketing services to Cavaliers for several years, and the Amended Complaint alleges that sports and entertainment venues have stated a desire to obtain secondary ticketing services from Flash Seats but have refused to do so as a direct result of Ticketmaster's threats.

Ticketmaster's reference to and attachment of the 2009 Ticket Summit Schedule (TM Memo at 7, n.5), only confirms that the industry as a whole today recognizes secondary ticketing as a separate and distinct market.[5]  Such industry recognition is evidence of separate and distinct product markets.  *See Spirit Airlines, Inc. v. Northwest Airlines, Inc.*, 431 F.3d 917, 933-35 (6th

---

[5] Examining the evidence Ticketmaster submits with its brief, it is clear that whatever the future of primary and secondary ticketing products may be, the industry continues to recognize clear distinctions between them.  The description of the seminar that Ticketmaster highlights in its brief is particularly telling in this regard.  It states that among the topics covered will be "***how the secondary market continues to provide value***."  (TM Memo at 7, n.5, Ex. 3.)  The obvious implication of this discussion topic is that secondary ticketing products offer unique properties and benefits for sports and entertainment venues that primary ticketing products do not.  This further underscores the separate demand and functionality of secondary ticketing as a unique product.

Cir. 2005) (reversing grant of summary judgment where evidence from industry participants demonstrated an industry-wide acceptance of a distinct product market for price conscious or leisure air travelers).[6]

## III.  Conclusion

As the foregoing demonstrates, the Amended Complaint adequately alleges the relevant markets for primary and secondary ticketing.  Ticketmaster's Motion to Dismiss should therefore be denied.

---

[6] In any event, Ticketmaster's request that the court take judicial notice of materials outside of the complaint as proof of facts it alleges in its supplemental memorandum is inappropriate.  (*See, e.g.*, TM Memo at 7 n.5 & 10 n.6, Ex. 3 & 4.)  When ruling on a motion to dismiss, matters outside of the complaint "are not to be considered by a court." *Weiner v. Klais & Co.*, 108 F.3d 86, 88 (6th Cir. 1997); *see also Habeeba's Dance of the Arts, Ltd. v. Knoblauch*, No. 05-926, 2006 U.S. Dist. LEXIS 25837, at *6 (S.D. Ohio May 1, 2006) (citing *Roth Steel Prods. v. Sharon Steel Corp.*, 705 F.2d 134, 155 (6th Cir. 1982)) (court may not "consider extrinsic evidence in determining whether a complaint states a claim").  Courts may only consider materials attached to a defendant's motion to dismiss "if they are referred to in the plaintiff's complaint and are central to [plaintiff's] claim." *Weiner*, 108 F.3d at 89.  The outside materials of which Defendants request the Court to take judicial notice were not referred to by Plaintiffs in the complaint, and thus are not appropriate for consideration at the motion to dismiss stage.  These materials also are not susceptible to judicial notice.  Federal Rule of Evidence 201 only permits a court to take judicial notice of facts that are "not subject to reasonable dispute in that [they are] . . . capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).  The materials relied upon by Defendant unquestionably raise factual questions that are central to the very issues presently in dispute.  Rule 201, moreover, only permits a court to consider matters of public record "for the fact of the documents' existence," and not, as Ticketmaster requests, "for the truth of the matters asserted therein." *Passa v. City of Columbus*, No. 03-4111, 2005 U.S. App. LEXIS 2832, at *7 (6th Cir. Feb. 16, 2005) (unpublished).

Respectfully submitted,

/s/ Joseph A. Castrodale_____
Joseph A. Castrodale (18494)
Marvin L. Karp (21944)
Isaac Schulz (21009)
Thomas L. Anastos (43545)
Gregory J. Phillips (77601)
ULMER & BERNE LLP
Skylight Office Tower
1660 West 2nd Street, Suite 1100
Cleveland, Ohio  44113-1448
Tel:  (216) 583-7000
Fax:  (216) 583-7001
E-mail:jcastrodale@ulmer.com
          mkarp@ulmer.com
          ischulz@ulmer.com
          tanastos@ulmer.com
          gphillips@ulmer.com

*Attorneys for Cavaliers Operating Company,
LLC*

s/ Joseph C. Weinstein_____

Joseph C. Weinstein (23504)
Philip M. Oliss (66528)
Andrew R. Kruppa (72858)
SQUIRE, SANDERS & DEMPSEY LLP
127 Public Square, Suite 4900
Cleveland, OH 44114-1304
Tel:  (216) 479-8500
Fax:  (216) 479-8780
Email: jweinstein@ssd.com
          poliss@ssd.com
          akruppa@ssd.com

Edward A. Geltman
Christopher H. Gordon
Iain R. McPhie
SQUIRE, SANDERS & DEMPSEY LLP
1201 Pennsylvania Avenue, NW
Washington, D.C. 20004
Tel:  (202) 626-6600
Fax:  (202) 626-6780
Email: egeltman@ssd.com
          cgordon@ssd.com
          imcphie@ssd.com

*Attorneys for Flash Seats, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 19, 2008, a copy of the foregoing was filed electronically.

Notice of the filing will be sent to all parties by operation of the Court's electronic filing system.

Parties may access this filing through the Court's system.

/s/ Joseph C. Weinstein
*One of the Attorneys for Flash Seats, LLC*